UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| SETH EBER, HOWARD ETTELMAN, RONNY J. HALPERIN, CHARLES HANSEN, III, MELISSA K. RICE, LUZ RODRIGUEZ AND KEVIN D. SEPE, | ) ) ) ) ) ) ) |
| Defendants, | ) ) |
| WEST COAST INVESTMENTS ENTERPRISES, LLC, | ) ) ) |
| Relief Defendant. | ) ) |

### COMPLAINT

Plaintiff Securities and Exchange Commission alleges:

### I. SUMMARY OF THE ACTION

1. From April 2008 through at least June 2009, Defendants Seth Eber, Howard Ettelman, Ronny J. Halperin, Charles Hansen, III, Melissa K. Rice, Luz Rodriguez, and Kevin D. Sepe engaged in an illegal stock distribution scheme that enabled them to profit by more than $2.5 million.

2. The scheme involved the purchase of HydroGenetics, Inc., a small public company purportedly in the business of acquiring emerging alternative energy companies. The

Defendants then arranged to improperly convert HydroGenetics' debt into free-trading shares that they dumped on the investing public.

3. Each of the Defendants played a significant role in the transactions. Sepe orchestrated the scheme and directed Rice to assign interest in the debt to himself, Eber, Ettelman, Halperin's daughter, and Rodriguez so they could convert the debt into shares.

4. Rice and another attorney drafted legal opinion letters required for the conversion of HydroGenetics' debt into more than 240 million purportedly free-trading shares and the subsequent sale of such shares in unregistered transactions. The opinion letters improperly stated the shares were exempt from registration. This resulted in the unlawful issuance of shares in the form of unrestricted share certificates, which made it easier for Sepe, Eber, Ettelman, Halperin's daughter, Rice, and Rodriguez, to sell the shares on the public market.

5. Hansen and Halperin, who were HydroGenetics directors, signed multiple corporate resolutions authorizing the conversion of the debt into shares.

6. HydroGenetics issued unrestricted shares, directly or indirectly, to Eber, Ettelman, and in the name of Halperin's daughter, Rice, Rodriguez, and Sepe. They illegally sold the shares to the public without registering the transactions or having a valid exemption to registration, as the federal securities laws require, and profited by more than $2.5 million. Relief Defendant West Coast Investments Enterprises, LLC received $125,000 of Ettelman's ill-gotten gains.

7. Each of the Defendants violated Sections 5(a) and 5(c) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77e(a) and 77e(c), by distributing stock in unregistered transactions for which no exemption applied, or by playing a necessary and substantial role in such distributions. The Commission seeks: (i) to enjoin the Defendants from further violations of Section

5 of the Securities Act; (ii) disgorgement of Eber, Ettelman, Halperin, Rice, Rodriguez, and Sepe's ill-gotten gains, with prejudgment interest; (ii) civil money penalties against each Defendant; (iv) an order barring Eber, Ettelman, Halperin, Rice, Rodriguez, and Sepe from participating in an offering of penny stock; and (v) a professional services bar against Rice.

## II. DEFENDANTS, RELIEF DEFENDANT AND THE ENTITY

### A. Defendants

8. Sepe, age 55, resides in Miami, Florida. From April 2008 until approximately June 2009, he was the undisclosed control person at HydroGenetics. He is a long-time friend of Halperin and is listed as the officer or director of several private Florida companies. In September 2004, the Securities Commissioner of the State of Texas issued an emergency cease-and-desist order against Sepe, among others, finding he engaged in registration violations and securities fraud in connection with two securities offerings.

9. Rice, age 51, resides in Miami, Florida, and has been licensed to practice law in Florida since 2000. In 2008, Rice was HydroGenetics' sole director. From April 2008 through at least May 2009, Rice also provided legal services to HydroGenetics.

10. Eber, age 57, resides in Miami, Florida, and is a self-employed jeweler.

11. Ettelman, age 56, resides in Miami, Florida, and has provided accounting services to various companies Sepe and Rice own.

12. Halperin, age 63, resides in Aventura, Florida. He is an attorney licensed to practice law in Florida and is the sole member of law firm Ronny J. Halperin PA. From January 14, 2009 until April 16, 2009, Halperin was CEO of HydroGenetics. He also served as a HydroGenetics director from 2009 until late 2011.

13. Hansen, age 62, resides in Lighthouse Point, Florida. He has been HydroGenetics' CEO since April 16, 2009. Hansen was a registered representative from April 1996 to January 1998.

14. Rodriguez, 45, resides in Miami, Florida, and worked as an office administrator and assistant to Sepe during all times relevant to the facts alleged in the Complaint.

### B. Relief Defendant

15. West Coast Investments Enterprises, LLC is a Florida limited liability company formed on June 1, 2009. Rice is the entity's managing member and uses the entity for investing. West Coast received checks totaling $125,000 from Ettelman consisting of profits Ettelman made through the illegal sale of HydroGenetics stock. West Coast did not sell any goods or services to Ettelman justifying the $125,000 it received.

### C. Relevant Entity

16. HydroGenetics is a Florida corporation with its principal place of business in Fort Lauderdale, Florida. HydroGenetics' company name was originally Pop Starz, an entity that operated dance studios. On April 23, 2008, after Sepe and others had contracted to purchase Pop Starz, the company changed its name to Global Entertainment Acquisition, Inc. and was purportedly in the film-making business. On August 1, 2008 the company changed its name to HydroGenetics and stated it was in the business of acquiring emerging alternative energy companies. HydroGenetics and its predecessors are referred to as the "Company" or "HydroGenetics." Since January 2005, the Company's common stock has been registered pursuant to Section 12(g) of the Securities Exchange Act of 1934 (the "Exchange Act"). Its common stock is quoted on the OTC Link, operated by OTC Markets Group, Inc., under the trade symbol "HYGN.PK." At all relevant times, HydroGenetics' common stock was a penny

stock because it was an equity stock that did not trade above five dollars per share or meet any of the exceptions from the definition of penny stock contained under Section 3(a)(51) of the Exchange Act and Rule 3a51-1 thereunder.

### III. JURISDICTION AND VENUE

17. This Court has jurisdiction over this action pursuant Sections 20(b) and 22(a) of the Securities Act, 15 U.S.C. §§77t(b) and 77v(a).

18. The Court has personal jurisdiction over the Defendants and venue is proper in the Southern District of Florida. The acts, transactions, practices, and courses of conduct giving rise to the violations alleged in this Complaint occurred in the Southern District of Florida, and at all times relevant to the actions alleged in this Complaint, all of the Defendants resided in the District.

19. In connection with the conduct alleged in this Complaint, the Defendants, directly and indirectly, singly or in concert with others, have made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation and communication in interstate commerce, and the mails.

### IV. FACTUAL ALLEGATIONS

#### A. Sepe Buys Pop Starz' Convertible Debt And Creates HydroGenetics

20. On April 14, 2008, Sepe gained control of HydroGenetics' predecessor, Pop Starz, which was a publicly held Florida company in the business of operating dance studios.

21. Sepe and a small group of investors acquired Pop Starz by paying $235,000 in exchange for approximately 87% of Pop Starz's outstanding common stock and the convertible notes Pop Starz had issued to debt-holders (the "Notes").

5

22. Pop Starz had previously issued five Notes to debt holders for the purpose of paying public and private debt, among other things. Collectively, the Notes promised Pop Starz would repay approximately $550,000 in principal with accrued interest.

23. Pursuant to the terms of each Note, the Note Holder could, at any time, convert the principal and accrued interest into shares of Pop Starz common stock at a rate of no less than one cent per share.

24. In the April 2008 acquisition of Pop Starz, Rice was named the "Agent for Buyers" under each of the Note Purchase Agreements.

25. By April 22, 2008, Sepe owned a controlling stake in Pop Starz. Once in control of the Company, Sepe replaced its management with his own associates, first appointing Rice as the sole director and then replacing Rice with a secretarial assistant whom he also named president of Pop Starz.

26. Shortly after replacing Pop Starz's management, Sepe negotiated and directed the execution of a purported settlement agreement between Pop Starz and Rice in her capacity as Note Holder. The agreement, dated April 25, 2008, reset the Notes' conversion rate from no less than $.01 to $.0005 per share. This agreement increased by twenty times the amount of shares convertible from the Notes.

27. On April 23, 2008, Pop Starz changed its name to Global Entertainment Acquisition. On August 1, 2008, the Company changed its name again, to HydroGenetics.

### B. The Defendants Participated In An Unlawful Distribution Scheme To Issue Unrestricted Shares And Sell Them On The Public In Unregistered <u>Transactions In Violation Of Section 5 Of The Securities Act</u>

#### 1. <u>The Unlawful Distribution Scheme</u>

28. From April 2008 until June 2009, Sepe orchestrated the unlawful distribution of HydroGenetics' securities at least seven times. Each distribution followed essentially the same sequence of events.

29. Sepe provided Rice with a list of individuals to whom she, in her capacity as Note Holder, should assign partial interest in the Notes (the "Assignees"). The Assignees included Eber, Ettelman, Halperin's adult daughter, Rodriguez, and Sepe.

30. Rice then drafted a conversion notice for each Assignee's signature. The conversion notice stated the Assignee's interest in the convertible debt of the Notes should be converted into shares of HydroGenetics stock. Rice emailed the notices to Sepe so he could obtain the Assignees' signatures.

31. After receiving the executed conversion notices, Rice drafted and executed Assignments of Partial Interest in the Notes through which the Assignees received partial ownership interests in the Notes.

32. Hansen, Halperin, and Rice then executed the documents required for HydroGenetics' transfer agents to issue unrestricted share certificates of HydroGenetics stock to the Assignees.

33. Companies such as HydroGenetics that issue publicly-traded stock use transfer agents to keep track of the individuals and entities that own their stock. A transfer agent's core function is to issue and cancel a company's stock certificates to reflect changes in ownership. Generally, with certain exceptions, transactions in stock issued in a registered public offering are

"unrestricted," meaning the shares can be traded without restriction. On the other hand, transactions in stock issued in an exempt offering may require restrictive language in the form of a stamped legend on the stock certificates. Stock certificates bearing restricted legends cannot be traded as easily as stock without restrictive language. Before transfer agents will issue unlegended share certificates in the absence of registration, many require a lawyer's opinion explaining why it is legal for them to do so.

34. The HydroGenetics stock shares should have been restricted because the Assignees acquired them directly or indirectly from the issuer in a chain of transactions not involving a public offering. To issue the shares in certificates without restrictive legends, which would be easier for the Assignees to sell, the transfer agent required legal opinions stating the Assignees complied with Rule 144 of the Securities Act, 17 C.F.R. § 230.144. Rule 144 contains a series of conditions that, if properly met, will provide a reselling shareholder a safe harbor from the Securities Act's registration requirements and allow resale of restricted shares of stock. To rely on the Rule 144 safe harbor, a registered issuer must file periodic reports with the Commission as Rule 144(c) requires.

35. HydroGenetics was at all relevant times registered under Section 12(g) of the Exchange Act, and was therefore required to file periodic reports with the Commission. However, the Company never met these periodic filing requirements and, accordingly, the Rule 144 safe harbor was unavailable to the Assignees.

36. HydroGenetics retained Rice and another attorney to provide the legal opinion letters (the "Opinion Letters") to the transfer agent. The Opinion Letters falsely stated HydroGenetics was a non-reporting company and could rely on Rule 144. The Opinion Letters also said the Assignees had complied with the conditions of Rule 144 and that newly issued

shares of HydroGenetics stock, converted from its debt, should be issued to the Assignees without a restricted legend. The improper reliance on Rule 144 resulted in the wrongful issuance of unlegended shares.

37. No exemption of the federal securities laws applied to the issuance of unrestricted HydroGenetics shares to the Assignees. Nor did any exemption apply to the Assignees' subsequent distribution of the shares.

38. Additionally, Rice issued Opinion Letters stating the Notes could be converted into shares even after the Notes' convertibility was exhausted. This resulted in the over-conversion of approximately 107,500,000 shares.

39. After receiving the Opinion Letters, HydroGenetics' transfer agent issued unlegended share certificates of HydroGenetics stock to the Assignees. The Assignees sold the HydroGenetics shares in the public market for profits.

## 2. Unlawful Issuance Of HydroGenetics Shares From May 1, 2008 Until October 22, 2008

### a. May 1, 2008 Opinion Letter And Subsequent Conversion And Issuance Of Shares

40. The first unlawful distribution began on April 30, 2008, when Sepe provided Rice with a list of individuals to whom she should assign interest in Note 1 in her capacity as Note Holder. The assignees included Eber and Rodriguez, among others.

41. Rice drafted and executed assignments of partial interest in the Notes. On April 30, 2008, Rice also assigned partial interest in Note 1 to Sepe and stated she received "value" in exchange for this assignment.

42. The next day, HydroGenetics' outside counsel issued an Opinion Letter in which she opined HydroGenetics could issue 18,268 shares converted from Note 1 to the Assignees in certificate form as free-trading stock without restrictive legend pursuant to Rule 144(b)(1)(i).

43. However, the Opinion Letter falsely stated HydroGenetics was a non-reporting public company and therefore Rule 144 was applicable to provide a safe harbor to the Assignees. In truth, the Company had been a Section 12(g) registrant since early 2005 and was therefore required to file periodic reports with the Commission pursuant to Rule 144(c). Because the Company had failed to file any periodic reports, the safe harbor of Rule 144 was inapplicable.

44. In May 2008, Eber, Rodriguez, and Sepe improperly received a total of 4,000 shares of HydroGenetics stock in the form of unrestricted, unlegended share certificates. They sold these shares in the public market for profits.

### b. *June 23, 2008 Opinion Letter And Subsequent Conversion And Issuance Of Shares*

45. A second unlawful issuance occurred after HydroGenetics' outside counsel issued an Opinion Letter, dated June 23, 2008, in which she opined the Company could issue 29,100 shares converted from Note 2 to Assignees, including Rodriguez and Sepe, in certificate form as free-trading stock without restrictive legend pursuant to Rule 144(b)(1)(i). However, Rule 144 was inapplicable.

46. The June 23, 2008 Opinion Letter caused the transfer agent to improperly issue 6,000 unrestricted shares to Sepe and Rodriguez. Sepe and Rodriguez sold the shares in the public market for profits.

### c. *October 22, 2008 Opinion Letter And Subsequent Conversion And Issuance Of Shares*

47. A third unlawful distribution began in October 2008. On October 21, 2008, Rice assigned her interest in Note 3 to an Assignee.

48. On October 22, 2008, HydroGenetics' outside counsel issued an Opinion Letter in which she opined HydroGenetics could issue 18,125,073 shares converted from Notes 1, 2, 3, and 4 to various Assignees, including Halperin, Rodriguez, and Sepe, in certificate form as free-

10

trading stock without restrictive legend pursuant to Rule 144(b)(1)(i). However, the safe harbor under Rule 144 was inapplicable.

49. The October 22, 2008 Opinion Letter caused the transfer agent to improperly issue a total of 6,970,000 unrestricted shares to Halperin, Rice, Rodriguez, and Sepe. Rice, Rodriguez, and Sepe sold the shares on the public markets for profits.

### 3. Rice Replaces HydroGenetics' Outside Counsel To Issue Opinion Letters Causing The Over-Conversion Of More Than 100 Million Shares Of Stock From Notes Already Converted And Exhausted

50. The October 22, 2008 issuance exhausted the convertibility of Notes 1 through 4, so there was no remaining debt on these Notes to convert into shares.

51. In April 2009, Rice replaced HydroGenetics' outside counsel as the attorney issuing Opinion Letters. From April 9, 2009 until May 2009, Rice issued four Opinion Letters improperly opining Notes 1 through 4 could be converted into additional shares. In addition, Rice issued Opinion Letters dated May 18, 2009 and May 20, 2009 in which she opined it was proper to convert the debt in Note 5 into shares, even though the convertibility of Note 5 was also exhausted.

52. Hansen and Halperin also served as necessary and substantial participants in these unlawful distributions. In their capacity as HydroGenetics' Directors, Hansen and Halperin signed Board of Directors resolutions authorizing the conversion of the debts in the Notes into shares. Rice utilized these resolutions in her Opinion Letters.

53. Rice, Hansen, and Halperin's actions resulted in the over-conversion of debt into approximately 107,500,000 HydroGenetics shares in May and June 2009. Rice's Opinion Letters were also improper because they included false representations and improperly relied on Rule 144.

### a. *April 9, 2009 Opinion Letter And Subsequent Conversion And Issuance Of Shares*

54.     A fourth unlawful distribution began in April 2009. On April 8, 2009, Rice, in her capacity as Note Holder, assigned partial interest in Notes 1 through 5 to individuals whose names Sepe had provided her. The Assignees included Eber, Halperin's daughter, a company Rodriguez owned and controlled, and Sepe. According to the assignment, Rice received value in exchange for these assignments.

55.     On April 9, 2009, Rice issued an Opinion Letter in which she opined HydroGenetics could issue 120 million shares converted from Notes 1 through 5 to the Assignees, including Eber, Halperin's daughter, a company Rodriguez owned and controlled, and Sepe, in certificate form as free-trading stock without restrictive legend pursuant to Rule 144(b)(1)(i). However, the Rule 144 safe harbor was inapplicable.

56.     On April 9, 2009, Halperin, in his capacity as a HydroGenetics Director, signed a Certification and a Unanimous Written Consent of the Board of Directors authorizing the issuance of shares. Whereas the Notes were previously converted at a rate of $.0005 and $.01, Halperin's certification authorized the conversion of the Notes at a rate of $.0017.

57.     Based on Rice's improper April 9, 2009 Opinion Letter and Halperin's certification, the transfer agent issued 120 million shares of unrestricted HydroGenetics stock to the Assignees.

58.     Through this distribution, Eber, Halperin's daughter, Rodriguez's company, and Sepe received certificates for 34 million unrestricted shares and sold them in the public market for profits. Halperin's daughter sold her shares at Halperin's direction and transferred a portion of the proceeds to Halperin.

### b. *May 15, 2009 Opinion Letter And Subsequent Conversion And Issuance Of Shares*

59.  A fifth unlawful distribution began after Rice issued an Opinion Letter, dated May 15, 2009, in which she opined HydroGenetics could issue 5 million shares converted from Notes 1 through 5 to Sepe, in certificate form as free-trading stock without restrictive legend pursuant to Rule 144(b)(1)(i). However, the Rule 144 safe harbor was inapplicable.

60.  On May 15, 2009, Hansen signed a Resolution of HydroGenetics' Board of Directors authorizing the issuance of 5,000,000 shares of convertible shares from the Notes to Sepe.

61.  The transfer agent issued five million shares of unrestricted HydroGenetics stock to Sepe. Of this amount, approximately 2,300,000 shares were over-converted. The issuance to Sepe also exhausted the convertibility of Note 5. Sepe sold the shares in the public market for profits.

### c. *May 18, 2009 Opinion Letter And Subsequent Conversion And Issuance Of Shares*

62.  A sixth unlawful distribution began on May 18, 2009. Rice, at Sepe's direction and in her capacity as Note Holder, assigned partial interest in Notes 1 through 5 to Sepe, Eber, Ettelman, Halperin's daughter, and others. The convertibility of the Notes was already exhausted when this assignment occurred.

63.  On that same date, Halperin and Hansen, in their capacity as Directors, signed an Action by Unanimous Written Consent of HydroGenetics' Board of Directors in which they stated they had determined the debt in the Notes was convertible into shares at a rate of $.0017, and authorized the conversion. The convertibility of the Notes was already exhausted.

64.  On that same date, Rice issued an Opinion Letter in which she opined HydroGenetics could issue 66,500,000 shares converted from Notes 1 through 5 to herself and

13

various Assignees, including Eber, Ettelman, Halperin's daughter, and Sepe, in certificate form as free-trading stock without restrictive legend pursuant to Rule 144(b)(1)(i). However, the Rule 144 safe harbor was inapplicable.

65. The transfer agent issued 66,500,000 shares of unrestricted HydroGenetics stock to Rice and the Assignees. All of these shares were over-converted shares because all of the Notes had previously been exhausted.

66. Through this distribution, Rice, Eber, Ettelman, Halperin's daughter, and Sepe received 28 million unrestricted shares in the form of unlegended share certificates and sold them in the public market for profits. At Halperin's direction, his daughter sold her shares and transferred a portion of the profits to Halperin.

### d. May 20, 2009 Opinion Letter And Subsequent Conversion And Issuance Of Shares

67. The seventh unlawful issuance began after Halperin and Hansen, in their capacity as Directors, signed a May 20, 2009 Action by Unanimous Written Consent of HydroGenetics' Board of Directors in which they stated they had determined the debt in the Notes was convertible into shares at a rate of $.0017, and authorized the conversion. However, the convertibility of the Notes had already been exhausted.

68. That same day, Rice issued an Opinion Letter in which she opined HydroGenetics could issue 43,794,000 shares converted from Notes 1 through 5 to herself and various Assignees, including Ettelman and Sepe, in certificate form as free-trading stock without restrictive legend pursuant to Rule 144(b)(1)(i). However, the Rule 144 safe harbor was inapplicable.

69. On June 8 and 12, 2009, two more unlawful distributions began when Halperin and Hansen, in their capacity as Directors, signed Actions by Unanimous Written Consent of

HydroGenetics' Board of Directors in which they stated they had determined the debt in the Notes was convertible into shares at a rate of $.0017, and authorized the conversion of the debt into shares. However, the convertibility of the Notes had already been exhausted.

70. The transfer agent issued 38,794,000 over-converted shares of HydroGenetics stock from Notes 1 through 5. Of this amount, Rice, Ettelman, and Sepe received 19,794,000 shares of unrestricted HydroGenetics stock and sold the shares in the public market for profits.

### 4. Illegal Sales Proceeds

71. Through the unlawful distribution scheme, Sepe, Rice, Eber, Ettelman, Halperin's daughter, and Rodriguez collectively sold more than 91.4 million HydroGenetics shares and reaped $2,625,590 in illegal sales proceeds.

72. From July 23, 2009 through September 25, 2009, Ettelman wired West Coast $125,000 consisting of profits he made through the illegal sale of HydroGenetics stock. West Coast did not sell any goods or services to Ettelman justifying the $125,000 it received.

73. Sepe realized $1,316,466; Rice $422,445; Rodriguez $353,443; Eber $174,689; and Ettelman $165,997. At Halperin's direction, his daughter sold her shares and transferred at least $90,000 of the proceeds to Halperin.

## COUNT I

## VIOLATIONS OF SECTIONS 5(a) AND 5(c) OF THE SECURITIES ACT

### (Against All Defendants)

74. The Commission repeats and realleges paragraphs 1 through 73 of its Complaint.

75. No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities and transactions described in this Complaint and no exemption from registration existed with respect to these securities and transactions.

76. From April 2008 through June 2009, the Defendants directly and indirectly:

(a) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell securities as described herein, through the use or medium of a prospectus or otherwise;

(b) carried securities or caused such securities, as described herein, to be carried through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; or

(c) made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of a prospectus or otherwise, as described herein, without a registration statement having been filed or being in effect with the Commission as to such securities.

77. By reason of the foregoing, the Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court:

### I.

### Declaratory Relief

Declare, determine, and find that the Defendants have committed the violations of the federal securities laws alleged herein.

### II.

### Permanent Injunctive Relief

Issue permanent injunctions pursuant to Rule 65(d) of the Federal Rules of Civil Procedure enjoining all Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with him, from directly or indirectly violating Sections 5(a), 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

### III.

### Disgorgement and Prejudgment Interest

Issue an Order directing Eber, Ettelman, Halperin, Rice, Rodriguez, Sepe, and West Coast to disgorge all ill-gotten gains, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

### IV.

### Civil Money Penalties

Issue an Order directing each Defendant to pay civil penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d).

### V.

### Penny Stock Bar

Issue an order barring Eber, Ettelman, Halperin, Rice, Rodriguez, Sepe, and West Coast from participating in any offering of penny stock, pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), for the violations alleged herein.

### VI.

### Professional Legal Services Bar

Issue an order barring Rice from providing professional legal services to any person in connection with the offer or sale of securities pursuant to, or claiming, an exemption under Section 4(1) of the Securities Act, including, without limitation, participating in the preparation or issuance of any opinion letter related to such offerings based on her violations of Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

VII.

**Further Relief**

Grant such other relief as this Court may deem just and appropriate.

VIII.

**Retention of Jurisdiction**

Further, the Commission respectfully requests the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

Respectfully submitted,

May 2, 2012                    By: _____
                               Amie Riggle Berlin
                               Senior Trial Counsel
                               Florida Bar No. 630020
                               Telephone: (305) 982-6322
                               Facsimile: (305) 536-4154
                               E-mail: berlina@sec.gov

                               Attorney for Plaintiff
                               **SECURITIES AND EXCHANGE COMMISSION**
                               801 Brickell Avenue, Suite 1800
                               Miami, Florida 33131
                               Telephone: (305) 982-6300
                               Facsimile: (305) 536-4154